Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN KITA,

         Plaintiff,

    v.

THE CITY OF SEATTLE, a municipal corporation,
K.V. OSHAKAWA-CLAY, a police officer, *et al.*

        Defendants.

C10-0160-JCC

**ORDER**

      This matter comes before the Court upon Defendants' motion for summary judgment. (Dkt. No. 22). The Court has also considered Plaintiff's response (Dkt. No. 30), Defendants' reply (Dkt. No. 35), and the parties' various supporting exhibits and declarations. Having therefore reviewed the record and concluded that oral argument is unnecessary, the Court hereby DENIES the motion for the reasons explained below.

ORDER, C10-0160-JCC
Page 1

I.      **BACKGROUND**

This matter sounds in claims of excessive force by a police officer. Plaintiff John Kita's

allegations are stated succinctly in his complaint:

> On or about February 2, 2008, Seattle police officer K.V. Oshakawa-Clay, with excessive
> force, unlawfully beat [Plaintiff], threw him to the ground, kneed him in the back, beat
> him more, extremely twisted his arm, and twisted and bent his legs to a hog-tie position. .
> . . [Plaintiff] was injured during the incident.

(Complaint 3 (Dkt. No. 1)). Plaintiff submitted a digital recording of the underlying incident along with

his complaint. The incident was recorded from the dashboard camera of the police cruiser assigned to

Defendant K.V. Oshakawa-Clay, who is a police officer employed by Defendant City of Seattle. (*Id.*).

**A.      Digital Recording**

The relevant portion of the digital recording begins as Defendant K.V. Oshakawa-Clay

approaches the intersection of Sixth Avenue and Cherry Street in downtown Seattle. From the

perspective of Defendant's dashboard camera, the viewer can see two individuals in the distance,

struggling with each other beside a parked car. One of the individuals pushes the other to the ground. As

Defendant approaches the individuals in his patrol car, he makes a right-hand turn, which places the

individuals briefly out of the range of the dashboard camera. Defendant then makes a left-hand turn, and

the two individuals come back into the camera's range. The patrol car is approximately forty to fifty

yards from the two individuals. One of the two individuals is standing outside the driver's side of the

parked car, while the other is sitting in the driver's seat.

As Defendant's patrol car approaches the two individuals, the scene comes into sharper focus.

The person standing outside the open driver's side door of the parked car is Plaintiff, and he is arguing

with the person sitting in the driver's seat, his then-girlfriend Janie Teston. The patrol car stops

approximately ten yards from the two individuals; Plaintiff remains standing outside the open car door.

He walks away from Defendant, around the rear side of the parked car and approaches the passenger's

side door.

1  Defendant gets out of his patrol car and enters the scene. He is walking away from his patrol car

2  and toward the parked car. His right hand is on his firearm, and his left hand is signaling for Plaintiff to

3  move toward him. Plaintiff complies, moving directly toward Defendant.

4  As Plaintiff closes the distance between Defendant and himself, Defendant signals toward the

5  hood of his patrol car with his right hand, telling Plaintiff to place his hands on the patrol car. Plaintiff

6  puts his right hand in his pocket and continues moving directly toward Defendant. Plaintiff turns his

7  head briefly back toward the parked white car, and then removes his right hand from his pocket. He

8  opens both his hands, exposing to Defendant his open palms. Defendant then grabs Plaintiff's right arm

9  and forces Plaintiff to the hood of the patrol car. Defendant uses his own right hand to press Plaintiff's

10 right hand against the patrol car's hood. With his left hand, Defendant reaches over Plaintiff's back and

11 attempts to secure Plaintiff's left arm, which is beneath Plaintiff's body. Presumably, Defendant is doing

12 so in order to press Plaintiff's left hand against the patrol car's hood. Plaintiff is using his left hand to

13 hold a pair of eyeglasses. Defendant states to Plaintiff: "Give me your hands." Plaintiff complies, lifting

14 his open left palm toward Defendant. The eyeglasses fall to the hood of the patrol car.

15 Defendant suddenly strikes Plaintiff forcefully in the back of the head with the heel of his hand.

16 Plaintiff's head bounces once off the patrol car's hood. Plaintiff maintains both of his hands in an open

17 position. Defendant then uses both of his hands to grab Plaintiff's right arm and drag Plaintiff across his

18 own body and onto the ground. Plaintiff is lying on the ground approximately three to five feet from the

19 patrol car. He has therefore moved out of the camera's range, which falls instead on the hood of the

20 patrol car. Defendant remains within the camera's range. He stands over Plaintiff, astride him.

21 Defendant places his left knee on Plaintiff's back and then twice strikes Plaintiff sharply with his closed

22 left hand. Defendant's blows appear to have fallen on Plaintiff's head or upper back.

23 The digital recording then depicts Defendant grabbing Plaintiff's right hand and forcing it behind

24 his back. Plaintiff's left hand appears to have already been behind his back. It then appears as though

25

26 ORDER, C10-0160-JCC
Page 3

1   Defendant places both of Plaintiff's hands beneath his own knee, which he is still using to pin Plaintiff

2   to the ground. Keeping his left hand on Plaintiff, Defendant then uses his right hand to communicate *via*

3   a radio-communication device with other police officers. Two other police officers arrive less than thirty

4   seconds later. One officer appears to secure Plaintiff's legs while Defendant handcuffs Plaintiff's hands

5   behind his back. Plaintiff then re-enters camera range as Defendant and the assisting officer help him to

6   his feet and instruct him to sit on the patrol car's front bumper. They search Defendant's pockets while a

7   third assisting police officer discusses the matter with Ms. Teston, who had gotten out of the car while

8   Plaintiff was still lying on the ground.

9   The camera suddenly swings: A police officer has changed the camera range so that it falls on

10  the back seat of the patrol car. Defendant is sitting in the back seat, handcuffed. He has been arrested.

11  (Digital Recording).

12  **B.     Police Department's Response**

13  One of Defendant's supervisors reviewed the incident on the same day when it occurred. His

14  report concludes: "The use of force by [Defendant] was necessary and within the Department's use-of-

15  force policy. The quick reaction, sound decision-making ability, and restraint used by [Defendant] with

16  this noncompliant, intoxicated and assaultive suspect is praiseworthy." (Supervisor Report 3 (Dkt. No. 33

17  at 7)). A command review of the incident followed on February 15, 2008. The conclusion was

18  substantially the same: "[Defendant] used the minimum force necessary to encourage the suspect to

19  comply. The suspect complained of no injury, but did in fact comply." (Command Report 4 (Dkt. No. 33

20  at 9)).

21  **C.     Plaintiff's Alleged Injuries**

22  Today, Plaintiff alleges that he cannot turn his neck without pain, and that he experiences tingling

23  in his fingers. Plaintiff also alleges that he experiences anxiety and flashbacks. (Kita Decl. 3 (Dkt. No.

24  32)). Plaintiff attributes these problems to the forceful manner in which Defendant arrested him:

25

26  ORDER, C10-0160-JCC
    Page 4

Prior to this incident, I had no problems with my neck and had no tingling in my fingers. When up against [Defendant's] car, I had my back to [Defendant] and my neck was completely exposed to forces on it and my head. Each time that [Defendant] struck the back of my head, I did not see the blow coming and was not prepared for it. Prior to being beaten by [Defendant], I was in excellent health. I had no pain or other deformity to my neck.

(*Id.* 3–4).

**D.    Procedural Background**

Plaintiff commenced this matter by filing a complaint with this Court in January 2010. (Dkt. No. 1). Plaintiff alleged that Defendant K.V. Oshakawa-Clay violated his Fourth Amendment right to be free from unreasonable seizures by using excessive force during the arrest at issue. (*Id.* 4). Plaintiff also alleged a variety of state-law claims against Defendant Oshakawa-Clay, including assault and intentional infliction of emotional distress. (*Id.*). Finally, Plaintiff alleged that Defendant City of Seattle negligently supervised Defendant Oshakawa-Clay. (*Id.* 5). As this matter has developed, Plaintiff has essentially alleged that Defendant City of Seattle negligently trained Defendant Defendant Oshakawa-Clay, and that this negligent training caused the underlying violation of Plaintiff's Fourth Amendment rights. (*See* Response *passim* (Dkt. No. 30)).

Defendant City of Seattle and Defendant Oshakawa-Clay filed a joint motion for summary judgment in December 2010. (Dkt. No. 22). Defendant Oshakawa-Clay argued that he is entitled to summary judgment because the arrest was reasonable as a matter of law. Even if the arrest were unreasonable, Defendant Oshakawa argues, he is nonetheless entitled to summary judgment because of a qualified immunity which he enjoys. (*Id.* 16–24). Defendant City of Seattle also argues that it is entitled to summary judgment for two separate reasons: First, it argues that the arrest was reasonable as a matter of law, and that Plaintiff therefore never suffered any cognizable legal injury whatsoever. (*Id.* 12). Second, Defendant City of Seattle argues that even if Plaintiff's constitutional rights were violated, Plaintiff cannot produce any evidence tending to indicate that his injuries were caused by a custom or policy of Defendant City of Seattle.

## II.      LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that this Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In some circumstances, however, summary judgment is improper even when the material facts are undisputed: "Summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts." *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970).

If this Court wrongly enters summary judgment against a plaintiff, it has invaded the province of the jury and deprived the plaintiff of his Seventh Amendment right to a jury trial. As the Ninth Circuit cautioned trial courts as long ago as 1957: "[The summary-judgment] device should not be used as a substitute for trial on the facts and law. Especially is this true when the parties are entitled to trial by jury. It may be that the plaintiff cannot win this lawsuit before a jury. The mere fact that the trial judge conceives this to be true does not endow him with authority to take the place of the jury and decide hotly contested issues of fact." *Cox v. English-American Underwriters*, 245 F.2d 330, 333 (9th Cir. 1957). This Court must therefore exercise caution when considering a motion for summary judgment, especially in a case that involves a person's constitutional rights. *See* Wright & Miller, Federal Practice and Procedure: Civil 3d § 2732.2 ("Cases premised on alleged violations of the constitutional or civil rights of plaintiffs frequently are unsuitable for summary judgment.").

## III.     RELEVANT LAW

The Fourth Amendment requires that all seizures be objectively reasonable: "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1988). "The test of reasonableness under the Fourth Amendment is not capable of precise

1   definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In order to determine

2   whether a police officer used reasonable force when effecting a particular seizure, this Court must

3   therefore carefully balance "the nature and quality of the intrusion of the individual's Fourth

4   Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at

5   396 (internal markings omitted).

6         In short, "the question [is] whether the totality of the circumstances justifie[s] a particular type of

7   search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). Factors that properly bear upon the

8   totality of circumstances include "the severity of the crime at issue, whether the suspect poses an

9   immediate threat to the safety of the officers or the crime at issue, whether the suspect poses an

10   immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

11   attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. All determinations of unreasonable force

12   must also "embody allowance for the fact that police officers are often forced to make split-second

13   judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force

14   that is necessary in a particular situation." *Id.* at 396–397.

15   **A.    Qualified Immunity**

16         Public officials sued under the Civil Rights Act are entitled to assert the affirmative defense of

17   qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1981). In resolving a government official's

18   claim to qualified immunity, this Court conducts a two-step inquiry: First, the Court "must decide

19   whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."

20   *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815–16 (2009) (internal markings and citations

21   omitted). If a plaintiff has failed to allege facts constituting the violation of a constitutional right, the

22   inquiry is at an end: The government official is entitled to qualified immunity. If, on the other hand, the

23   plaintiff has successfully cleared the first hurdle, the analysis continues. The second step requires that this

24   Court "decide whether the right at issue was 'clearly established' at the time of the defendant's

25

26   ORDER, C10-0160-JCC
    Page 7

1    misconduct." *Id.* at 816. In short, "[q]ualified immunity is applicable unless the official's conduct

2    violated a clearly established constitutional right." *Id.* at 816. A constitutional right is "clearly

3    established" for the purposes of a qualified-immunity analysis if "it would be clear to a reasonable officer

4    that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

5    **B.   Municipal Liability**

6         A municipal corporation is a "person" for the purposes of the Civil Rights Act of 1871, *codified*

7    *in relevant part at* 42 U.S.C. § 1983, and a municipality is therefore liable if it violates a person's

8    constitutional rights. *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978). Municipal liability

9    extends to those constitutional deprivations which were caused by official policy or by local custom.

10   The Supreme Court has explained: "[A]lthough the touchstone of the § 1983 action against a

11   government body is an allegation that official policy is responsible for a deprivation of rights protected

12   by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the

13   statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom,' even

14   though such a custom has not received formal approval through the body's official decisionmaking

15   channels." *Id.* at 690–91. The Court has also explained that "a municipality cannot be held liable *solely*

16   because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983

17   on a *respondeat superior* theory." *Id.* at 692 (emphasis in original).

18   **IV.   DISCUSSION**

19        Because Plaintiff has submitted evidence from which a reasonable fact-finder could conclude

20   that Defendant K.V. Oshakawa-Clay violated his Fourth Amendment right to be free from excessive

21   force, his claims against Defendant Oshakawa-Clay survive. Because Plaintiff has also submitted

22   evidence from which a reasonable fact-finder could conclude that Plaintiff's injuries were caused by

23   Defendant City of Seattle's alleged local custom of sanctioning the constitutional violations of its police

24   officers, his claims against Defendant City of Seattle also survive.

25

26   ORDER, C10-0160-JCC
     Page 8

1    **A.      Defendant K.V. Oshakawa-Clay**

2            The undisputed facts of Plaintiff's case against Defendant K.V. Oshakaway-Clay are

3    susceptible to competing inferences. At one point, Defendant struck Plaintiff forcefully on the back of

4    his head. This fact cannot be ignored. It tends to indicate that Defendant used excessive force while

5    arresting Plaintiff. Whether Defendant's forceful arrest was reasonable under the circumstances

6    depends upon several factors that require further explanation at trial—including the severity of the

7    crime at issue, the threat which Plaintiff posed to Defendant and to other individuals, and whether

8    Plaintiff was actively resisting arrest at the time of the incident. *See Graham*, 490 U.S. at 396. The

9    parties disagree over some of these factors, and the digital recording is not dispositive. For example,

10   Defendant argues that the digital recording demonstrates that Plaintiff "was actively resisting the

11   placement of his hands in a spread position," and that he exhibited "pre-attack behavior." (Motion 5

12   (Dkt. No. 22)). According to Defendant, he used a "distraction technique" to strike the back of

13   Plaintiff's head, and he used "just enough force to accomplish the objective." (*Id.*). Plaintiff describes

14   the contents of the digital recording very differently. He argues, for example, that he "immediately

15   complied without delay" to each and every one of Defendant's orders, and denies having resisted arrest

16   or otherwise behaved combatively. (Response 3–4 (Dkt. No. 30)).

17           Because this Court cannot tell for certain which party is right, this is an easy decision: The jury

18   shall decide. *See Perry*, 431 F.2d at 1022 ("Summary judgment should not be granted where

19   contradictory inferences may be drawn from undisputed evidentiary facts."). The Court therefore denies

20   Defendant K.V. Oshakawa-Clay's motion for summary judgment on the merits. Because the right to be

21   free from a police officer's use of excessive force was clearly established at the time of the underlying

22   incident, *see Garner*, 471 U.S. at 8–9, and because Plaintiff has successfully alleged facts that could rise

23   to a violation of that right, this Court also denies Defendant K.V. Oshakawa-Clay's motion for qualified

24   immunity.

25

26   ORDER, C10-0160-JCC
     Page 9

**B.      Defendant City of Seattle**

The potential liability of Defendant City of Seattle is contingent upon the liability of Defendant K.V. Oshakawa-Clay. If the jury were to find that Defendant Oshakawa-Clay behaved appropriately, the City cannot be held liable because the jury would have concluded that there was no constitutional violation whatsoever. If, on the other hand, jurors determine that Defendant Oshakawa-Clay violated Plaintiff's constitutional rights, they could also reasonably conclude that Defendant City of Seattle has a custom of ratifying the wrongful behavior of police officers, and that this custom proximately caused Plaintiff's injuries.

The undisputed facts indicate that at least two of Defendant Oshakawa-Clay's supervisors reviewed the digital recording of the underlying incident, and that each praised his behavior. The first report describes his "quick reaction, sound decision-making ability, and restraint" as "praiseworthy." (Supervisor Report 3 (Dkt. No. 33 at 7)). A second report concluded that Defendant had "used the minimum force necessary to encourage the suspect to comply." (Command Report 4 (Dkt. No. 33 at 9)). Jurors may agree with these conclusions. If so, they will have concluded that Defendant Oshawaka-Clay behaved appropriately, and will have therefore also concluded that Defendant City of Seattle is not liable for Plaintiff's injuries. On the other hand, jurors may *disagree* with the supervisors' conclusions. If so, they are entitled to receive evidence on the issue of whether an alleged systematic lack of accountability for police abuses within the City of Seattle police department caused the injuries of which Plaintiff complains.

Defendant's arguments to the contrary fail because they all rely upon *official municipal policy*, which predictably states truisms like, "Supervisors have an important responsibility in reviewing use-of-force situations and in correcting and coaching officers in this area." (*See* Motion 10 (Dkt. No. 22)). Plaintiff's allegations sound in *custom* rather than *policy*, however: Because Plaintiff alleges that police supervisors maintain the *custom* of ratifying the constitutional violations of police officers, and because

Plaintiff has submitted some evidence to support this allegation, summary judgment is inappropriate. *See Monell*, 436 U.S. at 690–91 ("[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom,' even though such a custom has not received formal approval through the body's official decisionmaking channels."). The motion for summary judgment of Defendant City of Seattle is therefore denied.

**V.    CONCLUSION**

For the aforementioned reasons, the Court hereby DENIES Defendants' motion for summary judgment. (Dkt. No. 22).

SO ORDERED this 11th day of April, 2011.

JOHN C. COUGHENOUR
United States District Judge